**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PRINTING PACKAGING & PRODUCTION
WORKERS UNION OF NORTH AMERICA
et al.,

        *Plaintiffs*,

   v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

        *Defendant*.

Civil Action No. 23-1872 (TJK)

## MEMORANDUM OPINION

In June 2022, the International Brotherhood of Teamsters ("IBT") announced its intention to terminate at year's end its Merger Agreement with the Graphic Communication International Union ("GCIU") that many years before had formed the Graphic Communications Conference of the International Brotherhood of Teamsters ("GCC"). After negotiations stalled, the GCC sued, successfully compelling arbitration and securing a preliminary injunction maintaining the status quo into 2023 while it pursued arbitration and prepared for the impact of the agreement's termination. In arbitration, the GCC sought damages, but not specific performance, for the IBT's purported breach of contract. After the May 2023 arbitration hearing ended—but before the arbitrator rendered a decision—the GCC dropped its suit maintaining the preliminary injunction. The parties then agreed that the Merger Agreement was terminated, and the GCC changed its name to the Printing Packaging & Production Workers Union of North America ("PPPWU").

All's well that ends well? Not quite. The IBT then claimed authority over the PPPWU, arguing that the merger remained in force in some way, even if the Merger Agreement were no more. So the PPPWU brought this suit for declaratory and injunctive relief that would recognize

the PPPWU as separate from the IBT.  And in a final twist, after the arbitrator rendered his deci-

sion, the IBT reversed course, arguing that the Merger Agreement was never terminated after all.

For the following reasons, the Court will grant the PPPWU the relief it requests.

## I.     Background and Procedural History

In January 2005, two international unions, the GCIU and the IBT, entered into an agree-

ment to form the GCC.  *See* Merger Agreement, ECF No. 1-1.

The Merger Agreement provided for its termination under narrowly defined circumstances

within the first two years:

- The merger would terminate automatically "if the 2005 Conven-
  tion of Teamsters Canada fail[ed] to adopt an amendment to the
  Bylaws of Teamsters Canada as provided in" the Merger Agree-
  ment, *id.* § 7.14.1, or "if the 2006 IBT Convention fail[ed] to
  adopt an amendment to protect [the] Merger Agreement . . . or
  fail[ed] to create a vacancy for the GCIU/IBT Conference Pres-
  ident on the IBT General Executive Board," *id.* § 7.14.2.

- The GCIU was permitted to "withdraw from [the] merger if the
  GCIU/IBT Conference President [was] not elected to a position
  on the IBT General Executive Board."  *Id.* § 7.14.3.

Beyond these circumstances, the merger was evidently intended to be permanent, as it could not

be "abrogated or modified by unilateral action by either party."  *Id.* § 7.19.  But it could be termi-

nated by mutual consent.  *See id.* § 7.16.  In any event, none of these circumstances came to pass,

so the unions maintained a relationship governed by the Merger Agreement for the next seventeen

years.  Freeman Decl. ¶ 3, ECF No. 3-2.

But the IBT became dissatisfied with that relationship for several reasons, apparently re-

lated to the degree of autonomy the GCC maintained and financial obligations between the two

entities.  So in June 2022, the IBT gave the GCC notice orally and then in writing that it would be

unilaterally terminating the Merger Agreement, effective at the end of the year.  *Id.* ¶¶ 5–7. Spe-

cifically, the IBT's June 30, 2022 letter stated: "This is to confirm our meeting on June 23, 2022,

where, on behalf of the [IBT], I informed you that the [IBT] is terminating the July 1, 2004, merger agreement with the GCIU, effective December 31, 2002." *See* ECF No. 29 at 4–5 (letter admitted into evidence as Plaintiffs' Exhibit 1 without objection at preliminary-injunction hearing).  The GCC, apparently trying to salvage the relationship, negotiated with the IBT to maintain the merger and offered some concessions.  Freeman Decl. ¶¶ 6–7.  Unable to agree, however, in late October 2022, the IBT informed the GCC that its originally announced termination date of December 31, 2022, would stand.  *Id.* ¶¶ 10–11; ECF No. 16 at 4.  So the GCC requested arbitration of the dispute, as provided for in the agreement.  Freeman Decl. ¶ 10*; see* Merger Agreement § 7.16.  The IBT refused.  Instead, it demanded that the GCC vacate the IBT's headquarters by the end of the year.  Freeman Decl. ¶ 11.

In response, the GCC sued in November 2023, seeking to compel arbitration of their dispute.  *See* Compl., *GCC v. IBT*, No. 22-cv-3484 (CRC) (D.D.C. Nov. 14, 2022), ECF No. 1.[1]  The GCC also moved for a preliminary injunction preventing the IBT's termination of the Merger Agreement until the parties could complete arbitration.  *See* Mot. for Prelim. Inj., ECF No. 2.  The GCC was concerned that without a preliminary injunction, its members would lose access to an IBT-sponsored healthcare plan once the IBT's termination took effect.  Freeman Decl. ¶ 14.  On December 9, 2022, Judge Cooper granted the preliminary injunction.  *See* Order, ECF No. 11.  He found that because the dispute was likely subject to arbitration given the Merger Agreement's arbitration provision, the GCC was likely to succeed on the merits.  *See* Prelim. Inj. Hr'g Tr. at 38–39 (Dec. 9, 2022), ECF No. 12.  He also concluded that the "GCC would be irreparably harmed if the status quo were not preserved pending a final decision on arbitrability."  *Id.* at 39–40.  He noted that "[a]rbitrating the termination after it occurs would frustrate the GCC's right to arbitrate."

---

[1] The ECF citations in this paragraph refer to this case before Judge Cooper.

*Id.* at 40.  As a result, the preliminary injunction preserved the status quo, even as the IBT's December 31, 2022, termination deadline passed.  *See id.*

The GCC and the IBT then arbitrated the dispute, starting with a preliminary conference in March 2023.  *See* Award, ECF No. 25-4; ECF No. 25-5.  The arbitrator held hearings on May 18 and 19, 2023, with post-hearing briefing completed in July 2023.  Award at 3.  The GCC sought damages for the harm caused by the IBT's unilateral termination and anticipatory breach.  *See, e.g.*, ECF No. 25-5 at 2 ("Counsel for the GCC argued that a unified arbitration should be scheduled at which the parties would arbitrate whether the IBT had the right to terminate the merger agreement and present evidence and expert testimony of the damages the GCC will suffer as a result of a unilateral termination."); Award at 12 ("The GCC requests . . . the assessment of damages related to the IBT's anticipatory breach of the agreement.").  At the same time, the GCC disavowed seeking specific performance of the Merger Agreement.  S*ee* ECF No. 25-6 at 31 (GCC's counsel confirming that "if we reach the remedy phase, the GCC will not be seeking specific performance of the merger agreement"); Award at 12 ("Finally, the GCC believes that its relationship with the IBT is irreparable and, therefore, specific performance would be an inadequate remedy.").

On the last day of the arbitration hearing—May 19, 2023—the GCC voluntarily dismissed its federal-court action against the IBT.  Award at 11.  It "did so because [it] no longer needed the protection of the preliminary injunction."  Freeman Decl. ¶ 19.  By this point, the GCC had made other healthcare arrangements and otherwise "had enough time to prepare for [its] separate existence and ensure a 'clean break' from the IBT."  *Id.*  So, now considering itself separate from the IBT, the GCC reconstituted itself as the Printing Packaging & Production Workers Union of North America, or PPPWU.  *Id.* ¶ 21.

With the preliminary injunction dissolved, the IBT sent a letter to PPPWU members on June 14, 2024, acknowledging "that the Merger Agreement [was] gone." ECF No. 1-3 at 3. Indeed, up until this point, the IBT had not withdrawn its previous assertions that it was terminating the Merger Agreement. Freeman Decl. ¶ 20. But in the same letter, the IBT insisted that it "*never* requested or contemplated the termination of the *merger itself*." ECF No. 1-3 at 2. Therefore, according to the IBT, "all former GCC local unions, District Councils[,] and their members remain[ed] Teamster local unions and members." ECF No. 1-4 at 2.

These developments "confus[ed] and frustrat[ed]" the PPPWU's leadership. Freeman Decl. ¶ 26. The IBT had never claimed that its termination of the Merger Agreement would result in the GCC's remaining within the IBT in some way. *Id.* On the contrary, the IBT had repeatedly suggested that the two unions would—and always did—exist as separate entities. For example, in arguing against irreparable harm during the preliminary-injunction hearing before Judge Cooper, the IBT explained that "[the GCC] will no longer be a conference of the IBT. It will go back to becoming an international union." Prelim. Inj. Hr'g Tr. at 18, *GCC v. IBT*, No. 22-cv-3484 (CRC) (Dec. 9, 2022), ECF No. 12. Likewise, during arbitration, the IBT represented that "[n]ever, never did any of the GCC members become IBT members." ECF No. 19-3 at 7. The IBT further acknowledged that "[p]art of the deal that the GCIU wanted in 2005 was to stay independent of the imprimatur of the IBT. *And they did*." *Id.* at 8 (emphasis added). As a result, "[t]here was never a merger" and "never a need to unscramble the egg." *Id.*

Thus, the PPPWU brought this lawsuit in June 2023 because the IBT continued to insist that the merger had somehow survived the termination of the Merger Agreement.[2] *See* Compl.,

---

[2] Plaintiffs consist of the PPPWU and two of its District Councils. For brevity, the Court refers only to "the PPPWU."

ECF No. 1.  It sought a declaratory judgment stating that it is a distinct, standalone union with no affiliation with the IBT and that the IBT's rules do not apply to it.  *Id.* at 24–25.  The PPPWU also sought to enjoin the IBT from purporting to assert authority or jurisdiction over it.  *Id.* at 25.  Thus, the PPPWU moved for a preliminary injunction to that effect.  *See* ECF No. 3.  But after the IBT consented to a stipulated order not to assert authority or jurisdiction over the PPPWU (and its local and district councils) while this suit was pending, the PPPWU requested—and the IBT did not oppose—that the hearing on the preliminary-injunction motion be consolidated with a trial on the merits, which the Court granted.[3]  *See* ECF Nos. 18, 22.  At the same time, the Court postponed the consolidated hearing to allow the arbitrator to reach a decision before the Court resolved this case on the merits.  *See* ECF No. 22 at 4–6.

In September 2023, the arbitrator issued his decision.  The question he resolved was framed as: "Can the IBT terminate the merger with the GCC with reasonable notice?  If so, what period of time shall constitute reasonable notice?"  *See* Award at 4.  The arbitrator concluded that the IBT "could not unilaterally terminate the GCC Merger Agreement, with or without reasonable notice." *Id.* at 2.  But the arbitrator also found that the GCC had limited its claim for a remedy because of its strategic decision to drop the action pending before Judge Cooper, "thereby allowing the injunction blocking the termination of the Merger Agreement to dissolve," resulting in "the termination of the Merger Agreement." *Id.* at 18.  As a result, the arbitrator determined that the GCC could not "now seek a remedy for harm triggered by its own strategic decision, likely made based on long term sustainability considerations."  *Id.*

---

[3] Such consolidation is "particularly appropriate" where, as here, (1) "the relief sought in the complaint is the same relief sought in the preliminary injunction"; (2) "there will remain no other issues to litigate once the preliminary injunction is resolved"; and (3) "the relevant facts are undisputed."  *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62–63 & n.1 (D.D.C. 2014) (citation omitted).

The parties submitted supplemental briefing about how, if at all, the arbitrator's decision should affect this case.  The PPPWU argued that the arbitrator's decision tracked its position.  *See* ECF No. 25 at 7.  The PPPWU further maintained that the IBT had repudiated the Merger Agreement, and that after Judge Cooper's preliminary injunction dissolved, the Merger Agreement was terminated.  *See id.* at 7–12.  The IBT, after initially arguing that the merger had somehow survived the termination of the Merger Agreement in its opposition to the PPPWU's preliminary injunction motion, *see* ECF No. 16 at 8, now argued, among other things, that because the arbitrator found that the IBT lacked the authority to unilaterally terminate the Merger Agreement, the Merger Agreement remained in effect, *see* ECF No. 26 at 9.  The Court then held a hearing on the motion, consolidated with a trial on the merits.  *See* ECF No. 29.

## II.   Legal Standard

Because the Court consolidated the hearing on the preliminary-injunction motion with a trial on the merits, the Court will resolve the parties' dispute by applying the standard it would if it treated their filings "as cross-motions for summary judgment."  *See, e.g.*, *Soundboard Ass'n v. FTC*, 251 F. Supp. 3d 55, 62 (D.D.C. 2017), *vacated on other grounds*, 888 F.3d 1261 (D.C. Cir. 2018); *Ark Initiative v. Tidwell*, 895 F. Supp. 2d 230, 237 (D.D.C. 2012); *Ass'n of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432, 1436 (D.C. Cir. 1994).

Cross-motions for summary judgment are evaluated under the same standards as those applied to independently filed motions.  *See Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing the "absence of a genuine issue of material fact" in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In determining whether there are genuine factual issues in dispute, [courts] must draw all reasonable inferences in favor of

the nonmoving party." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## III.   Analysis

The Court finds that the relationship between the GCC and the IBT was contractual, because they remained distinct entities, even under the Merger Agreement; that the IBT repudiated the Merger Agreement by unilaterally terminating it; and that once the preliminary injunction maintaining the status quo was lifted on May 19, 2023, the Merger Agreement ceased to exist. Thus, the PPPWU and the IBT are now separate entities, and the Court will award the declaratory and injunctive relief requested by the PPPWU.

### A.   The Relationship Between the GCC and the IBT Was Contractual; They Were Separate but Affiliated Entities Under the Merger Agreement

To begin, as the PPPWU repeatedly points out, the relationship between the GCC and the IBT was contractual. Before executing the Merger Agreement, the GCIU and the IBT existed as two separate, international unions. But even after the merger, the GCC and the IBT continued as separate—but related—entities whose relationship was governed by the Merger Agreement. Thus, although they nominally referred to their relationship as a "merger," the GCC and IBT were never fused into a single entity. As explained below, their relationship was better characterized as an "affiliation." And although the IBT does not directly contest the conclusion that their relationship was contractual—it is hard to see how it could—the Court will briefly address this point at the outset because the law of contract is central to resolving this dispute.

Labor unions often involve complex hierarchies and relationships. Thus, the Office of Labor-Management Standards ("OLMS") of the U.S. Department of Labor distinguishes between union "mergers" and "affiliations"—even though such terms may often colloquially be used

interchangeably.[4]  In this context, "[t]he term 'merger' refers to a changed relationship among unions whereby one union (or more) ceases to exist, and its membership and assets are absorbed by a new or an existing union."  *Id.*  By contrast, "an 'affiliation' contemplates a changed relationship between unions with no previous affiliation, whereby all unions continue to exist."  *Id.*

OLMS lists factors to help determine whether two unions have merged or whether they maintain a separate existence.  Those factors include:

> whether the existence of the entity is recognized by means of a charter, reference in the parent body's constitution, or some other manner; whether it has its own constitution and bylaws or other governing rules; whether it has a distinct and identifiable membership; whether it may accept or reject application for membership; whether it has its own officers; whether it holds meetings as a unit with some regularity or frequency; whether it has assets of its own; whether it may expend funds allocated to it or raised by it; whether it may assess and collect dues, fees, or assessments; whether it may discipline its members; whether it is represented as a unit at conventions or meetings of a parent or other body; and whether it engages in collective bargaining, grievance handling, or any business arrangements.

Office of Labor-Management Standards, DOL, *OLMS Interpretive Manual* § 030.603 (last updated Feb. 11, 2022), https://perma.cc/67LB-TUDT.

Applying those factors here, it is an easy call that the GCC and the IBT remained separate entities even after the Merger Agreement went into effect.  The PPPWU explains that "the GCC retained a lot of autonomy and operated separately from the IBT."  Freeman Decl. ¶ 4 (listing factors signifying the unions' separateness).  For example, "[t]he GCC's existence and autonomy was recognized and guaranteed by the Merger Agreement itself."  *Id.* ¶ 4(b); *see also* Merger Agreement § 2.4 ("All Local Unions and District Councils shall maintain and continue their autonomy."); *id.* §§ 2.7–2.8 (noting that the assets and funds held by the GCC and its affiliates would "remain [their] property").  The Merger Agreement also declared that for purposes of governing

---

[4] *See* Office of Labor-Management Standards, DOL, *Labor Union Mergers and Affiliations* (last updated Oct. 30, 2019), https://perma.cc/6HQMRDCW.

the GCC, the GCC's Constitution would be supreme to the IBT's, with the IBT's applying only when the former was silent on an issue.  *See* Merger Agreement, § 3.1 ("In the event of any conflict or inconsistency among these documents, . . . the GCIU Constitution and the Merger Agreement shall govern over the IBT Constitution . . . .").  Moreover, to the extent the parties contemplated the possibility that the merger would someday be terminated, they simply expected the unions to disaffiliate and return to the status quo ante.  *Id.* § 7.14.2 ("If the merger is so terminated, then . . . all members within the GCIU/IBT . . . shall cease their membership in the IBT" and "the GCIU shall be restored to its pre-merger status . . . .").

That the GCC and the IBT remained separate entities was also reflected in many practical ways after the Merger Agreement became effective.  For example, members of the GCC maintained "their own GCC authorization cards."  Freeman Decl. ¶ 4(f).  Further, "[t]he GCC had full authority to accept or reject members" and thus also "had its own membership application and oath/obligation."  *Id.* ¶ 4(h).  In addition, ordinarily, "if a labor organization should lose its identity through merger, that is, if it should cease to exist as a separate union, then it must file a terminal report."  Office of Labor-Management Standards, DOL, *Labor Union Mergers and Affiliations*, *supra*.  The GCC never filed a terminal report, and even after the Merger Agreement, it "continued to file an annual LM Report with the Department of Labor."  Freeman Decl. ¶ 4(e).

The IBT says little in response on this point, only briefly arguing that the GCC "never operated independently of the IBT," in connection with its argument that the merger somehow survived the termination of the Merger Agreement.  *See* ECF No. 16 at 10–11.  The IBT points out that other conferences within the IBT continued to file annual LM reports, as the GCC did.  *See id.*  But this factor is just one of many that supports the Court's conclusion that the GCC maintained its status as a separate but affiliated entity.  *See* Freeman Decl. ¶ 4.  Indeed, the IBT itself has

acknowledged that the GCC operated independently.  *See, e.g.*, ECF No. 19-3 at 7–8 ("There was a silo established" that "allowed the GCIU to create a stand-alone independent conference. . . . [T]he GCIU wanted in 2005 . . . to stay independent of the imprimatur of the IBT.  And they did."); *see also id.* at 7 ("This agreement was never, despite its name, [a] merger agreement.").  Indeed, as a practical matter, this entire dispute could not have happened if the two entities had merged into one.

The upshot of all this is that the relationship between the GCC and the IBT was governed by the law of contract, even after the parties entered into the Merger Agreement.  The Merger Agreement, between two labor unions, is a "contract" under Section 301 of the Labor Management Relations Act.  *See Int'l Bhd. of Boilermakers v. Loc. Lodge D111*, 858 F.2d 1559, 1560 n.1 (11th Cir. 1988).  It is therefore interpreted according to ordinary principles of contract law, at least when those principles are consistent with federal labor policy.  *See Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57 (1957).

### B.   The IBT Repudiated the Merger Agreement

The Court agrees with the PPPWU that when the IBT announced its intent to unilaterally terminate the Merger Agreement, that functioned as a repudiation under contract law.  "A repudiation occurs when an obligor . . . informs an obligee 'that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach[.]'" *Alabama v. North Carolina*, 560 U.S. 330, 350 (2010) (quoting Restatement § 250(a)).  "In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.  Mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation . . . ."  Restatement § 250 cmt. b.

The IBT repudiated the Merger Agreement.  In June 2022, it informed the GCC that it intended to unilaterally terminate it.  Award at 8.  The GCC disputed the IBT's ability to do so,

but in the IBT's June 30, 2022 letter, the IBT confirmed its intent to do so, without equivocation, effective at the end of the year. *See* ECF No. 29 at 5, 7. After the GCC tried to negotiate with the IBT for several months, the IBT doubled down. In October 2022, the IBT declined to agree to arbitration and instead demanded that the GCC vacate the IBT headquarters by the December 31, 2022 deadline. Freeman Decl. ¶ 11. All that is more than enough for the GCC to have "reasonably interpreted" that the IBT would be unilaterally terminating the Merger Agreement, effective at the end of the year. Restatement § 250 cmt. b.[5]

Of course, if the IBT could unilaterally terminate the Merger Agreement, that would not constitute a breach and thus would not constitute a repudiation. *Cf.* Restatement § 235 cmt. b ("Non-performance is not a breach unless performance is due."). But the IBT lacked that authority. And as the arbitrator found, "[t]he parties took clear steps to assure that the Merger Agreement could not be terminated by the unilateral action of either party." Award at 14. There were only a few methods for termination, none of which applied here, and some of which, in fact, were time-limited anyway. *See id.* at 15. So because the IBT lacked the authority to unilaterally terminate the Merger Agreement, its "decision to terminate . . . constituted a repudiation . . . and hence a material breach." *Rambus Inc. v. Hynix Semiconductor Inc.*, 629 F. Supp. 2d 979, 1013 n.2 (N.D. Cal. 2009) (discussing a situation in which a party "purportedly terminated" a contract despite "not hav[ing] a right to terminate").

The IBT argues that it did not repudiate the Merger Agreement. *See* ECF No. 27 at 6–9. But if this was not a repudiation, what would be? The IBT maintains that there was no

---

[5] No doubt, such a unilateral termination would also count as a "total breach" of the Merger Agreement. *See* 23 *Williston on Contracts* § 63:3 (4th ed. May 2024 update) ("A 'total breach' is a breach that so substantially impairs the value of the contract to the injured party [that it] . . . allow[s] that party to recover damages based on all of its remaining rights to performance.").

"appear[ance] that the [IBT] [had] unequivocally refused to perform" nor a "positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." *City of Fairfax v. WMATA*, 582 F.2d 1321, 1326 (4th Cir. 1978) (citations omitted). Specifically, the IBT says that it only ever expressed an *intention* to terminate the Merger Agreement—an intention belied by its continuing negotiations with the GCC in the latter half of 2022. *See* ECF No. 27 at 7 (The IBT "merely communicated [its] *intention* to terminate the Merger Agreement in the future."). At bottom, though, what the IBT describes *is* a repudiation: a promise not to perform. Restatement § 250(a) (defining repudiation as "a statement . . . indicating that the obligor will commit a breach"). And even in its negotiations with the GCC, the IBT continued promising to breach the Merger Agreement by repeatedly insisting that it would be unilaterally terminating it in a few months' time. On June 23, 2022, the IBT announced intent to terminate. *See* Award at 8. This was followed by a confirmation of that intent a week later. *Id.* at 9. And then later, after "[n]egotiations broke off," the "December 31, 2022 unilaterally-declared terminated date remained." *Id.* In other words, even after negotiating with the GCC, the IBT insisted that its intention was to unilaterally terminate the Merger Agreement, and so that repudiated the Merger Agreement.

### C.    The Merger Agreement Was Terminated

After a party repudiates a contract, the non-repudiating party has options. That party may "treat the promise to breach . . . as a breach itself." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632–33 (D.C. Cir. 2017) (quoting *Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 294 (4th Cir. 2010)). Phrased differently, the party may "elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract." *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). This, crucially, has the effect of "terminating the contractual relation between the parties." *Id.* Alternatively, the party "may continue to treat the

contract as valid and await the designated time for performance before bringing suit." *Id.* "The non-repudiating party must, however, make an affirmative election." *Id.* Thus, the legal effect of a repudiation—and whether it leads to a contract's termination—depends in some respects on the non-repudiating party's response to the repudiation.

Here, the GCC responded to the IBT's repudiation by relying on the repudiation and seeking damages for the breach, and so it treated the IBT's promise to breach as the breach itself. First, the GCC demanded arbitration of the dispute, and sued to enforce its right to arbitrate. Then, before the arbitrator in May 2023, the GCC sought "damages related to the IBT's anticipatory breach of the agreement." Award at 12. And it explicitly disavowed specific performance. ECF No. 25-6 at 31 (GCC's counsel confirming that "if we reach the remedy phase, the GCC will not be seeking specific performance of the merger agreement"). At that point, the IBT had not retracted its repudiation, and in any event its termination deadline had passed. *See* Freeman Decl. ¶ 20; *see also* Award at 13 (describing the IBT's position that "contracts without a duration clause or termination provisions are terminable upon reasonable notice"). Thus, the GCC's response "terminat[ed] the contractual relation between the parties." *Lucente*, 310 F.3d at 258.

Complicating matters here slightly, at the time of the arbitration hearing, a preliminary injunction was in place that prevented the agreement's termination. In the case before Judge Cooper, the GCC sought a preliminary injunction "prohibit[ing] [the IBT] from terminating the parties' Merger Agreement" pending arbitration, *see* Mot. for Prelim. Inj., *GCC v. IBT*, No. 22-cv-3484 (CRC) (D.D.C. Nov. 14, 2022), ECF No. 2-3, which he "granted," *see* Order, *GCC v. IBT*, No. 22-cv-3484 (CRC) (D.D.C. Dec. 9, 2022), ECF No. 11. But when the GCC dismissed the case on the last day of the arbitration hearing—thereby dissolving the preliminary injunction— the Merger Agreement was terminated. Nothing about the preliminary injunction, entered only to

14

preserve the status quo and prevent irreparable harm while in place—otherwise wiped the slate clean between the parties. *Cf. Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y.*, 749 F.2d 124, 126–27 (2d Cir. 1984) (preliminarily enjoining party's allegedly wrongful termination pending arbitration of the termination dispute's merits); *see also Toyo Tire Holdings of Ams. Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975, 980–81 (9th Cir. 2010) (defendants could be preliminarily enjoined from dissolving a joint venture until an arbitration panel considers plaintiff's claims).[6]

Indeed, the IBT itself repeatedly acknowledged the Merger Agreement's termination upon dissolution of the preliminary injunction. It did so in a June 2023 letter to the PPPWU. *See* ECF No. 1-3 at 3 (IBT letter acknowledging that "the Merger Agreement is gone"). It did so in moving to terminate the arbitration proceeding as moot around the same time. *See* ECF No. 25-3 at 3. And it did so when it filed its Answer in this case. Answer, ECF No. 14, ¶ 59 ("IBT admits that upon GCC's voluntary dismissal of its federal lawsuit on May 19, 2023, the termination of the Merger Agreement took immediate effect."). And the GCC "treat[ed] the promise to breach . . . as a breach itself." *Perry Capital LLC*, 864 F.3d at 632–33 (citation omitted). The IBT cannot reverse course after the GCC relied on the repudiation, sought damages for the breach, and de-clined to seek to maintain the contract. *See* 15 *Williston on Contracts* § 43:19 (A "retraction comes too late if the person reacting to the repudiation manifested an election to rescind the contract or materially changed position in reliance on the repudiation."). But that is effectively what the IBT

---

[6] As noted earlier, the Merger Agreement also permits termination by mutual consent. *See* Merger Agreement § 7.16. And as the arbitrator found, the GCC's dismissal of the case before Judge Cooper, and the resulting dissolution of the preliminary injunction, could also be thought of as "essentially consent[ing]" to the termination as well. Award at 18.

has tried to so since the arbitrator rendered his decision in September 2023.[7]

Moreover, the arbitrator's decision does not even support the IBT's position.  The IBT argues that the arbitrator's decision means the Merger Agreement remains in effect because the arbitrator found that neither party could terminate it unilaterally.  *See* ECF No. 26 at 9–10.  And it is true that the arbitrator determined that neither party could terminate the Merger Agreement unilaterally.  But that it is a separate issue from whether the agreement was *in fact* terminated.  "When a contract is terminated, *even wrongfully*, there is no longer a contract—'no contract'—no duty to perform and no right to demand performance, unless specific performance is sought, which it is not here; there is only a right to seek and a duty to pay damages caused by the termination."  *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996) (emphasis added).  Thus, even a party that lacks the authority to terminate a contract may do so anyway.  *See EraGen Biosciences, Inc. v. Nucleic Acids Licensing LLC*, 540 F.3d 694, 700 (7th Cir. 2008) ("This does not mean that [the party's] notice of termination was ineffective, but it does mean that [the party] may have ended the Agreement wrongfully.").  In other words, the wrongfulness of a termination does not mean there was no termination.  "If the contract was wrongfully terminated, it is still at an end."  *Id.* at 697.  And once it is at an end, the termination simply "gives rise to a claim on behalf of the aggrieved party."  *Id.*  Nothing in the arbitrator's decision suggests that the Merger Agreement is still in effect.  To the contrary, the decision refers to the GCC's decision to dismiss the suit before Judge Cooper, as "allowing the injunction blocking the termination of the Merger Agreement to dissolve," resulting in "the termination of the Merger Agreement."  Award at 18.

Apart from relying on the arbitrator's decision, the IBT also argues that the GCC is

---

[7]At this point, the IBT may also be foreclosed from arguing that the Merger Agreement has not been terminated as a matter of law, either because its statement in its Answer is a judicial admission or under the doctrine of judicial estoppel.  *See* ECF No. 25 at 16–18.

precluded from treating its repudiation as a total breach because the non-repudiating party's options in response to a repudiation are "mutually exclusive." ECF No. 27 at 8 (quoting *Lucente*, 310 F.3d at 258) (emphasis omitted). In the IBT's view, the GCC should have "assert[ed] that an anticipatory breach had occurred, and that the Merger Agreement had been terminated, . . . at the moment [the GCC] received the [termination notice] in June 2022." *Id.* at 9. The IBT says that instead, the GCC "continu[ed] to treat the Merger Agreement as valid" by continuing to engage in negotiations, and so cannot treat it otherwise now. *Id.*; *see also Lucente*, 310 F.3d at 258 ("[Non-repudiating party] may continue to treat the contract as valid and await the designated time for performance before bringing suit").

The problem with this argument is that the GCC disavowed specific performance and sought damages at its earliest opportunity, consistent with its right to seek arbitration under the Merger Agreement.[8] "There is no specific time limit within which to make th[e] election" of which option the non-repudiating party wishes to exercise. *Lucente*, 310 F.3d at 259. In this case, the GCC could not press for the damages remedy any earlier because the IBT refused to submit to arbitration—the forum in which the GCC had a right to bring its total-breach claim. *See* Freeman Decl. ¶ 11 (noting that the IBT declined to agree to arbitration in October 2022 and instead demanded that the GCC vacate the IBT headquarters by December 31, 2022). Thus, the question of remedies had not yet arisen. This is not a case in which the GCC "continue[d] to treat the contract as valid and await[ed] the designated time for performance before bringing suit." *Lucente*, 310 F.3d at 258. Instead, the GCC sought to arbitrate *before* the December 31, 2022, termination date,

---

[8] That the GCC pressed for arbitration under provisions within the Merger Agreement does not affect whether the agreement had been terminated. *See Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionary Workers Int'l*, 370 U.S. 254, 262 (1962) ("Arbitration provisions . . . are meant to survive breaches of contract, in many contexts, even total breach.").

but was forced to compel arbitration. The GCC's pursuit of an injunction to preserve the status quo so that it could pursue arbitration is not inconsistent with its decision to treat the IBT's repudiation as an anticipatory breach; doing so had no effect on the repudiation, the merits of the GCC's breach claim, or the remedies the GCC could pursue. *See, e.g.*, *Sauer-Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 350, 352 (7th Cir. 1983) (enjoining effects of repudiation until after arbitration and noting that the "right to seek injunctive relief in court and [the] right to arbitrate are not incompatible").

### D.   When the Merger Agreement Was Terminated, the Merger Was Too

The IBT, before it reversed course to maintain that the Merger Agreement remained in effect, also argued that the merger itself survived despite the end of the agreement. *See* ECF No. 16 at 8–9. The Court need not linger long on this theory, which the IBT supports with few facts and even less law. For all the reasons described above, the GCC and the IBT remained separate but affiliated entities even after the Merger Agreement; their relationship was governed by contract. Thus, when the contract was terminated, as the PPPWU argues, "the entire relationship between the parties under the contract ended." *Siskin Enters., Inc. v. W.B. Stoddard, Jr., Inc.*, 147 F. Supp. 2d 1125, 1129 (D. Utah 2001).[9] No other result makes sense, least of all that somehow the GCC became *more* subservient to the IBT in some way after the Merger Agreement ended. The IBT's position that some provisions remain effective, while others do not, is simply untenable.

The IBT relies on cherry-picked testimony from the arbitration hearing and snippets of the Merger Agreement to support this theory, but neither are close to persuasive. And as the PPPWU

---

[9] As mentioned above, arbitration provisions are an exception to this general rule. *See W&T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 169 (D.D.C. 2014) (discussing the "well-established law that arbitration provisions remain enforceable even after termination of an agreement, no matter the reason for the termination").

points out, the IBT repeatedly represented in the litigation before Judge Cooper that the Merger Agreement and the merger were one and the same.  For example, its counsel represented that upon termination of the Merger Agreement, "[the GCC] will no longer be a conference of the IBT.  It will go back to becoming an international union."  Prelim. Inj. Hr'g Tr. at 18, *GCC v. IBT*, No. 22-cv-3484 (CRC) (Dec. 15, 2022).  In the end, had these sophisticated parties wanted the merger to survive the Merger Agreement, they could have made that clear by including a "survival clause."  *See TSI USA, LLC v. Uber Techs., Inc.*, No. 16-cv-2177 (DLH), 2017 WL 106835, at *5 (N.D. Tex. Jan. 11, 2017) ("A survival clause's purpose is to enumerate any clauses that will remain in effect after the agreement's termination."), *aff'd*, 2017 WL 3209399 (N.D. Tex. June 19, 2017). They didn't.

### E.    The PPPWU's Requested Relief

The PPPWU requests declaratory relief recognizing that it is separate from the IBT and not subject to the IBT's authority or jurisdiction, and injunctive relief prohibiting the IBT from asserting such authority or jurisdiction.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  The Act incorporates a jurisdictional prerequisite.  *See Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016).  Specifically, "declaratory relief requires a determination of 1) an actual, substantial controversy, 2) involving an interested party, 3) that warrants the immediate issuance of a declaratory judgment."  *Id.*  Beyond that, courts have discretion "whether and when to entertain an action" seeking a declaratory judgment.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  Courts consider several factors in deciding whether to exercise that

discretion.[10]  In this Circuit, "two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  *Glenn*, 222 F. Supp. 3d at 36.

Injunctive relief may be granted under "well-established principles of equity."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  For a permanent injunction, a plaintiff must show the following four factors:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

The PPPWU has demonstrated that its requested declaratory and injunctive relief are appropriate.  As a result of the Merger Agreement's termination, the PPPWU and the IBT are distinct, standalone unions.  A declaratory judgment is warranted because it will "clarify[] the legal relations" between the PPPWU and the IBT and thereby "terminate and afford relief from the uncertainty" as to the parties' present relationship.  *Glenn*, 222 F. Supp. 3d at 36.[11]  And a permanent

---

[10] "Among the factors relevant to the propriety of granting a declaratory judgment are the following: whether it would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided."  *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976), *superseded by statute on other grounds*, 35 U.S.C. § 294, *as recognized in Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 892 F.2d 1066, 1072 (D.C. Cir. 1990).

[11] The jurisdictional prerequisite for a declaratory judgment is also met.  This case involves an interested party, the PPPWU, which has an actual, substantial controversy with the IBT because of the IBT's attempts to assert authority over the PPPWU, and that dispute warrants a declaratory judgment.  *See Glenn*, 222 F. Supp. 3d at 35.

injunction is warranted because the harm to the PPPWU caused by the IBT's continued assertion of authority and jurisdiction over it would be irreparable if not enjoined;[12] on balance, the equities favor awarding such relief; and the public interest similarly favors awarding such relief.  *See Morgan Drexen*, 785 F.3d at 694.  Finally, while the IBT has obviously contested the merits of the dispute over the relationship between the parties, it has never contested, if the Court resolved the merits in favor of the PPPWU, that these factors would support injunctive relief on the PPPWU's behalf.

## IV.    Conclusion

For all the above reasons, the Court will grant the PPPWU's motion, enter judgment on its claims, and enter its requested declaratory and injunctive relief.  In addition, the Court will order the parties to meet and confer on the issue of the IBT's counterclaim, including whether it is resolved by this Memorandum Opinion, and file a joint status report within 14 days reflecting their positions on any further proceedings necessary to do so.

A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 15, 2024

---

[12] The issue of irreparable harm receded into the background of this dispute after the IBT consented to a stipulated order not to assert authority or jurisdiction over the PPPWU while this suit was pending, and the Court consolidated the hearing on the preliminary-injunction motion with a trial on the merits.  But it is self-evident that the harm to the PPPWU caused by the IBT's continued assertion of authority and jurisdiction over it would be irreparable if not enjoined, *see* ECF No. 3-1 at 5–8, and the IBT has never argued otherwise.